IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE APPLICATION BY RHODIANYL S.A.S
AND RHODIA OPÉRATIONS S.A.S.
FOR ORDER FOR DISCOVERY
PURSUANT TO 28 U.S.C. § 1782.

Case No. 11-1026-JTM

MEMORANDUM AND ORDER

Applicants Rhodianyl S.A.S. and Rhodia Opérations S.A.S. seek a subpoena under 28 U.S.C. § 1782 to compel respondents INVISTA North America S.à r.l. and INVISTA S.à r.l. to produce evidence in their possession relating to certain chemical manufacturing technology. The Rhodia applicants seek the discovery to support ongoing private arbitration in France relating to the rights in a chemical manufacturing process. The INVISTA respondents oppose the request, arguing, among other things, that the statute was not intended to supply a means of discovery for purely private arbitrations.

The Court concludes that Congress did not intend 28 U.S.C. § 1782 to apply to purely private arbitrations of the type presented here. In addition, the Court finds in its discretion that, even if § 1782 were applicable to private arbitrations, no subpoena should issue in light of all the circumstances of the case.

**Background**

In the late 1960s, E.I. duPont des Nemours and Company created a new technology for the production of adiponitrile (ADN). ADN is a clear, colorless liquid that is a principal chemical intermediate used in the production of nylon 6,6, one of the two most common forms of nylon.[1] Adding hydrogen to ADN yields hexamethylenediamine (HMD). Adipic acid is added to the HMD to create nylon salts, which are then polymerized to produce nylon 6,6.

DuPont's technological breakthrough involved the introduction of the chemical compound hydrogen cyanide (HCN) to butadiene, yielding the hydrocyanation of butadiene, which was then used to create ADN. This new process significantly lowered the cost of ADN.

In 1974, DuPont's affiliate DuPont France entered into a Joint Venture Agreement ("JVA") with Société des Usine Chimiques Rhône-Poulenc ("SUCRP"), an affiliate of the contemporary leading French chemical company, Rhône-Poulenc. The JVA created a new entity and manufacturing site, known as Butachimie, at Rhône-Poulenc's industrial site in Chalampé, France. Under the JVA, Butachimie would make ADN using DuPont's butadiene-based technology.

DuPont licensed to Butachimie alone the technology to design and build the plant and manufacture ADN. SUCRP, which had no competitive ADN technology of its own,

---

[1] The other main form, known as nylon 6, is manufactured from the chemical intermediate caprolactam.

provided the site location, materials, and labor to construct and operate the plant under the direction of Butachimie.

Article 9 of the JVA prohibits the Butachimie partners from using or disclosing any confidential information relating to the production of ADN or ADN hydrogenation.

Butachimie has subsequently become the world's largest ADN manufacturing plant, and now annually produces about 500,000 tons of ADN, worth nearly $1 billion. Butachimie, half owned by SUCRP and half by DuPont France, has succeeded to the point that Rhône-Poulenc has closed its own ADN plants in France and Brazil.

After the JVA, and following restructuring at Rhône-Poulenc and a spinoff corporation, applicant Rhodia, SUCRP's 50% interest in Butachimie was transferred to Rhodianyl SNC, a subsidiary of Rhodia.

In 2004, respondent INVISTA bought DuPont's nylon intermediates business, and DuPont France's interest in Butachimie was transferred to KoSa France S.A.S., one of INVISTA's affiliates.

The parties disagree as to their respective rights for the production of ADN by improved or altered processes. According to INVISTA, the 1960-70s era process, which relied on using zinc chloride as a catalyst for the production of ADN, is a process internally known as Gen I technology. After the 1974 JVA, DuPont continued to develop other ADN technologies in Texas, ultimately resulting in a Gen II technology, which, again according to INVISTA, involves a different, triphenylboron catalyst. The Gen II process also involves differences in processes, equipment, and knowledge. Gen II is allegedly a much more efficient process than Gen I, producing more ADN and fewer byproducts from a given

amount of raw material chemicals.

In the 1980s, DuPont commercialized the Gen II technology by introducing it to its existing, Gen I ADN plant in Orange, Texas, and later at a new Gen II plant in Victoria, Texas. INVISTA contends that it has continued to improve and refine the Gen II technology, which it characterizes as highly confidential and proprietary trade secrets. Unlike GEN I, which was licensed to Butachimie, neither DuPont nor INVISTA has licensed GEN II production technology to any other entity.

INVISTA also alleges that it has recently been developing a next-generation technology ("NGT") for producing ADN. This NGT technology, now ready for commercialization, uses a different catalyst system from prior technologies, such as Gen I and Gen II.

Rhodia challenges INVISTA's characterization of GEN II and NGT as different technologies. It cites a statement from Mr. Paul Pearlman, that "Gen I, Gen II, and Gen III technologies are very closely related technologies." (Aff. McNeill Decl. Ex. 12).

A review of the cited document, or rather, the portion submitted to the court, indicates that focus of Pearlman's statement was directed at the Butachimie safeguards as GEN I knowledge, and the cited passage is taken from Pearlman's background description of the joint venture's licensing. The full (though still brief) passage states:

> DuPont's original technology for ADN was known as Gen I technology. However, as of 1994, DuPont had developed and implemented in its U.S. plants a Gen I1 technology for ADN, and was working on a Gen III technology. The Gen I, Gen II, and Gen III technologies are very closely related technologies but the Gen II technology has never been licensed to Butachimie and is used exclusively at INVISTA'S plants in Texas.

(*Id.*) It is thus unclear whether Pearlman's statement was anything more than an observation that all the technologies are "closely related" in that they are chemical processes for the production of ADN.

Rhodia also cites the testimony of former DuPont engineer Russell Shedd, who testified about DuPont's production history at Butachimie, contending that the testimony shows that DuPont engineers had used utilized some improvements to HCN heat refractors developed at Butachimie, and made similar improvements at DuPont's Sabine River, Texas Plant. (App. Reply Exh. 14, at 64, 66).

Again, the cited evidence does not fully support the weight attributed to it by the applicants. In the cited deposition excerpt, Shedd was asked about a previous statement to counsel in which he had indicated the existence of improvements common to both Butachimie and Sabine River. In a passage not cited in Rhodia's brief, he stated he could not recall the conversation, but agreed that there was "work ... done on the HCN converters [which] was a collaboration between Dupont and Butachimie, *and where it was appropriate, if it was appropriate*, I am sure that the Sabine River works incorporated those." (*Id*. at 65) (emphasis added). Shedd also disagreed with the suggestion that the innovation was a Butachimie improvement, testifying that the Rhodia engineers' role was merely in confirming the success of DuPont's idea, and that the HCN refractor technology was more accurately described as "[i]mprovements to the Butachimie plant from DuPont." (*Id*. at 69.)

On September 19, 2006, INVISTA announced plans to build a new plant for the production of nylon 6,6 in Asia, using its NGT system. Within a week, Rhodia announced its intent to also build a new ADN plant.

Three days after Rhodia's announcement, INVISTA advised Rhodia S.A., the parent of the applicant parties, that it had no rights to use any trade secrets disclosed to the Butachimie joint venture, and requested written assurances that Rhodia did not intend to use such information.

On October 3, 2007, Rhodia filed a claim for arbitration against KoSa France Holding S.à r.l., INVISTA S.à r.l., and INVISTA North America S.à r.l. seeking a ruling which would permit it to use the Butachimie technical information. The arbitration demand did not include any claim relating or referring to INVISTA's proposed ADN project in Asia.

Six days later, on October 9, 2007, INVISTA S.à r.l. filed suit in Texas state court against Rhodia S.A., alleging that Rhodia had misappropriated trade secrets and engaged in unfair competition. Rhodia then removed the suit to federal court.

In their Opposition to the request for subpoena, the respondents cite evidence obtained during the limited jurisdictional discovery in the Texas action indicating that Rhodia, to assist its new ADN plant (code-named "Adélie"), had been improperly removing technological information from Butachimie. The respondents cited internal emails and deposition testimony indicating that Rhodia secretly sought to "systematically transfer ... technical documents," and later directing that such emails be destroyed. (Resp. Decl. Exh. NN, PP, emails of July 13 and October 20, 2007).

On July 27, 2008, the Arbitral Tribunal conducted its first procedural hearing. The parties discussed the proposed Terms of Reference and Procedural Rules, and Rhodia's counsel stated that no document discovery was necessary. If any discovery were authorized, he stated, it should be narrow and limited in keeping with the contractual

nature of the proceedings:

> I can guarantee to you [the parties to the arbitration agreement] did not have in mind either an American-style discovery or productions of documents, and even less the deposition of witnesses, etc. Therefore, the legitimate expectation of the parties that entered into this arbitration agreement is certainly not to embark on this type of procedure.

(Resp. Ex. BB, at 215: 1-7.) Immediately following the procedural hearing, the parties signed the Terms of Reference and the Tribunal issued the Procedural Rules. The Terms of Reference stated that the arbitration's procedural rules would be governed by ICC Rules and the orders of the Tribunal. The Procedural Rules stated that the Tribunal would take "guidance" from the IBA Rules for the Taking of Evidence in International Arbitration (the "IBA Rules").

The IBA Rules provide that if a party "fails to produce any document ordered to be produced by the Arbitral Tribunal, the Arbitral Tribunal may infer that such document would be adverse to the interests of that Party." (Resp. Exh. EE, Art. 9.4.)

According to the respondents, Rhodia shut down the Adélie Project after the discovery in the Texas litigation. It began a new project named "Madras." INVISTA contends that although the Madras Project is purportedly independent, it relies on the same information which had been misappropriated from Butachimie to support Adélie.

Rhodia argued in the arbitration that INVISTA was also guilty of misappropriation of information from Butachimie. Thus, it had no right to object to Rhodia's alleged misconduct.

On February 27, 2009, Rhodia submitted its Phase I document requests. These include a request for:

21. Any document reflecting the use of Butachimie information in INVISTA's China project, including:

    (i) any documents, including the Basic Data Package, the Engineering Package, process flow diagrams or other designs, plans, or drawings that INVISTA is using or intends to use to design and construct its plant in Asia, and that reflect or contain any ADN technology developed at Butachimie;

    (ii) any documents reflecting any personnel that INVISTA is using or intends to use in its China project in a technological role who worked at Butachimie within the past 15 years.

(App. Reply Exh. 1, at 33-34).

On March 20, 2009, the Tribunal granted this request, overruling INVISTA's objections to relevance and overbreadth.

On May 8, 2009, INVISTA informed Rhodia that it had no documents which fell within the scope of the request, because it was not using any "technology developed at Butachimie" for its Asian plant. (Resp. Exh. H, at 2).

On June 2, 2009, Rhodia exercised its right under the Procedural Rules to request an adverse inference based on INVISTA's response to the document request. Based on that refusal, Rhodia argued the Tribunal should infer that "(a) Invista is using or intends to use personnel in their ADN project who worked at Butachimie in the last 15 years; and (b) Invista is attempting to hold Rhodia to a standard that they themselves do not believe is applicable." (Resp. Exh. I, at 5.)

INVISTA also submitted a request for adverse inference, based on Rhodia's failure to comply with several document requests that the Tribunal had granted. The Tribunal took the parties' requests for adverse inferences under consideration.

In a June 5, 2009 submission to the Tribunal, INVISTA stated that "for the avoidance of doubt, Respondents aver again that: (a) their ADN plant in Asia anticipates using their advanced ADN and HCN technology; and (b) their proposed ADN plant in Asia has not used any technology developed at Butachimie." (Resp. Exh. K 155.) It also submitted a witness statement by Benjamin Herzog, a longtime DuPont/INVISTA employee who testified that INVISTA was not using, nor did it intend to use, any technology developed at Butachimie in its proposed ADN plant.

On June 8, 2009, INVISTA confirmed its position again in a letter to the Tribunal, writing that "Respondents have repeatedly stressed that they are not using Gen I Technology to build a new ADN plant, and consequently have no responsive documents or witnesses on the subject." (Resp. Ex. M at 3.)

In January 2010, the Tribunal issued a Partial Award, resolving some of the legal issues in Phase I, including some jurisdictional questions. The Tribunal declined to address the parties' adverse inference requests "at this time," stating that "such adverse inferences could, possibly, be useful to decide claims, reserved for Phase II of this arbitration, or allegations of fact for which there is no need to express any opinion to address the issues of this Phase I." (Resp. Exh. Q at 40-41.)

In September 2009, Rhodia filed an application seeking to broaden the scope of the arbitration, claiming that INVISTA's Asian plant represented a misappropriation of Butachimie information.

In March 2010, the Tribunal denied the application, finding that Rhodia's allegations regarding INVISTA's ADN project were "entirely distinct from the claims" in the Gen I

Arbitration, would "complicate" the proceedings, and would "call for discovery and for new documents to be added to the proceedings" in Phase II. (Resp. Exh. P at 7). Such an expansion, the Tribunal stated, would undermine its "duty to conduct the proceedings as efficiently and cost effectively as possible." (*Id.*)

In August 2010, Rhodia initiated a new arbitration, the Butachimie Technology Arbitration, to pursue its claim relating to the Asian plant.

At approximately the same time the parties exchanged their Phase II document requests in the first arbitration. Rhodia's Phase II document requests included a new request for documents regarding INVISTA's ADN project, going beyond a request for evidence relating to Butachimie-derived technology or for employees currently working on the Asian project, but more broadly seeking:

> The full list of Respondents' personnel (including employees of Respondents' affiliates) having worked, currently working or expected to work on Respondents' project in Asia, including sufficient evidence that the specific restrictions, if any, applicable to the selection of such personnel in order to comply with the confidentiality obligations arising out of the JVA have been satisfied for each of the individuals in the list."

(Resp. Exh. S, at ¶ 3).

On October 4, the Tribunal ruled on the parties' document requests. The Tribunal granted INVISTA's requests for documents relating to the Madras and Adélie projects, but rejected Rhodia's request, ruling that it sought irrelevant information and that the point of the Gen I Arbitration was "by no means to establish whether Respondents have effectively satisfied  with [sic] the confidentiality obligations arising out of the JVA." (Resp. Exh. S.)

On November 17, 2010, Rhodia asked the Tribunal to direct INVISTA to produce the

documents requested in Rhodia's Phase I request. The next day, INVISTA stated that the Tribunal should "deny Claimants' attempt to reopen this issue from Phase I of the proceedings, which the parties argued before the Tribunal *ad nauseam* and which subsequent events have rendered moot." (Resp. Exh. U at 2.)

Rhodia wrote on November 25, 2010, and again on December 2, 2010, protesting INVISTA's refusal to supply the quested information. Rhodia's letters included a proposed confidentiality agreement, and stated that the claimants "continue to reserve their right to seek appropriate relief from this Tribunal or any competent judicial authority." (Resp. Exh. W & V).

On December 9, 2010, the Tribunal declined to grant either party any immediate relief, and refused to modify its prior procedural order. The Tribunal noted that it was "aware of [INVISTA's] position ... these documents are irrelevant ... to Phase II of the arbitration." (App. McNeill Exh. 8, at 2). Noting Rhodia's reservation of rights, the Tribunal stated that if Rhodia "intend to request any such relief, they shall do so no later than 15 days before the start of the evidentiary hearing." (Resp. Exh. X at 2.)

Rhodia wrote to the Tribunal and INVISTA again on December 20, 2010, with a proposed confidentiality agreement. As for the Respondent's outstanding documents, Rhodia referenced the confidentiality agreement and the claimants stated they would "respectfully request that the Tribunal invite [INVISTA] to ... sign." (Resp. Exh. Y at 2.)

On December 22, the Tribunal invited INVISTA to either sign the proposed confidentiality agreement or to present its "reasoned objections." (Resp. Exh. Z at 2.)

On January 4, 2011, INVISTA presented its objections to the Tribunal, stating that

it did not have any documents responsive to Rhodia's Phase I document request, and even if it did, the documents would be irrelevant to the arbitration. (Resp. Exh. AA at 6).

On January 12, 2011, Rhodia filed this Application pursuant to 28 U.S.C. § 1782.

**Conclusions of Law**

Rhodia seeks in its application information relating to INVISTA personnel who have worked on its Asian ADN project, as well as documents relating to the technological processes employed in that project. Rhodia argues that INVISTA has engaged in a pattern of refusal to comply with directives of the Arbitral Tribunal, and that accordingly it has "no alternative but to seek the assistance" of the court under § 1782. (Dkt. 34, at 9). Discovery is appropriate under § 1782, it contends, in light of the expansive reading supplied to the statute by the Supreme Court in *Intel Corp. v. Advanced Micro Devices*, 542 U.S. 241 (2004). It argues that the discovery is narrowly-tailored, and that the court should exercise its discretion under the statute to grant the relief sought.

INVISTA argues that it has violated no directive of the Tribunal, and that its technological processes are fundamentally different from those which have been the subject of the arbitration. It further contends that the private arbitration between the parties is not a "tribunal" within the meaning of § 1782, and that *Intel* has no direct application to the present case. It argues as well that, even if the private arbitration is construed to fall within the scope of § 1782, the court should still employ its discretion to deny the relief sought.

Because it plays such an important role in the arguments of both parties, a close

examination of the Supreme Court's decision in *Intel* is essential. The court will then review other courts' interpretations of § 1782 to seek discovery in support of foreign, private arbitrations.

*Intel* arose from antitrust litigation between computer companies Intel and Advanced Micro Devices (AMD). AMD instituted an action before the Directorate General-Competition of the Commission of the European Communities, alleging a violation of European competition law. In connection with this action, AMD also filed a motion for subpoena under § 1782 with the Northern District of California, seeking discovery. The District Court denied the application without evaluating it on the merits, holding that § 1782 did not authorize such discovery. The Ninth Circuit reversed, holding that § 1782 includes applications in support of proceedings before quasi-judicial or administrative agencies. The Supreme Court granted *certiorari* to resolve a split among the Circuit courts as to whether the § 1782 included a requirement for reciprocal foreign discoverability. *See* 542 U.S. at 253 n 7.

The Supreme Court affirmed the decision of the Ninth Circuit. First, the Court held that "interested persons" under § 1782 did not mean just "litigants," but included AMD as a complainant before the DG-Competition. Second, the court held that the request for a subpoena to support the investigation before the DG-Competition was a request for information "for use in a foreign or international tribunal" within the meaning of § 1782. Third, the Court rejected Intel's argument that § 1782(a) did not apply since the matter was still in the investigative stage. The Court held that § 1782 was not restricted to instances where judicial proceedings are pending or imminent. 542 U.S. at 259.

Next, the court resolved a split among lower courts as to whether application of §
1782 could be conditioned on reciprocity — whether the statute should be interpreted to
preclude "production of documents when the foreign tribunal or the 'interested person'
would not be able to obtain the documents if they were located in the foreign jurisdiction."
*Id.* The Court held that there was no such requirement. In response to Intel's policy
argument that such a rule could unfairly advantage a party seeking American discovery
from an opponent, while remaining shielded from reciprocal discovery owing to foreign
law protections, the Court found that such concerns were an insufficient basis for "a cross-
the-board discoverability rule." *Id.* at 262.

But while not a "categorical[] bar" to the issuance of a § 1782 subpoena in general,
*id.* at 259, the Court explicitly noted that concerns of parity and reciprocity may play a role
in  the decision of a district court to grant a subpoena in a given case. Thus, the court
suggested, "a district court could condition relief upon [a] reciprocal exchange of
information." *Id.* at 262.

Finally, the court specifically and repeatedly emphasized that "a district court is not
required to grant a § 1782(a) discovery application simply because it has the authority to
do so." *Id.* at 264.

> First, when the person from whom discovery is sought is a participant
> in the foreign proceeding (as Intel is here), the need for § 1782(a) aid
> generally is not as apparent as it ordinarily is when evidence is sought from
> a nonparticipant in the matter arising abroad. A foreign tribunal has
> jurisdiction over those appearing before it, and can itself order them to
> produce evidence. In contrast, nonparticipants in the foreign proceeding may
> be outside the foreign tribunal's jurisdictional reach; hence, their evidence,
> available in the United States, may be unobtainable absent § 1782(a) aid.

Second, as the 1964 Senate Report suggests, a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance. Further, the grounds Intel urged for categorical limitations on § 1782(a)'s scope may be relevant in determining whether a discovery order should be granted in a particular case. Specifically, a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States. Also, unduly intrusive or burdensome requests may be rejected or trimmed.

*Id*. at 264-65 (citations omitted).

As to the issue directly relevant here — what constitutes a "tribunal" within the meaning of § 1782 — the Court found that the proceeding before the DG-Competiton fell within the potential application of § 1782 for two reasons, reflecting both the structural nature of the European Commission's judicial process and the legislative history of § 1782. Critical to the first was the integral role of the DG-Competition in the subsequent judicial work of the European Commission. In its earlier discussion of the work of the DG-Competiton, the Court had pointed out that the decisions of the DG-Competition are "'subject to judicial review' by the Court of First Instance and, ultimately, by the court of last resort for the European Communities (The European Court of Justice)." 542 U.S. at 254 (quoting European Commission *Amicus Curiae* Brief, at 7). This judicial review existed at both the preliminary stage (if the DG-Competition declines to act on a complaint) and following any final decision. *Id*. at 254-55. Further, in noting that a complainant before the DG-General lacked formal status as a party or litigant, it "has significant procedural rights," which included the ability to submit evidence and to "seek judicial review." *Id*. at 255.

This structural role played a decisive factor in the Court's holding that the DG-Competition investigation could fall within the scope of § 1782.

> Beyond question, both the Court of First Instance and the European Court of Justice, qualify as tribunals. But those courts are not proof-taking instances. Their review is limited to the record before the Commission. Hence, AMD could "use" evidence in the reviewing courts only by submitting it to the Commission in the current, investigative stage.

*Id.* at 257.

The Court then found that this conclusion was also supported by the legislative history behind § 1782.

> Moreover, when Congress established the Commission on International Rules of Judicial Procedure in 1958, it instructed the Rules Commission to recommend procedural revisions "for the rendering of assistance to foreign courts *and quasi-judicial agencies*." §2, 72 Stat. 1743 (emphasis added). Section 1782 had previously referred to "any judicial proceeding." The Rules Commission's draft, which Congress adopted, replaced that term with "a proceeding in a foreign or international tribunal." Congress understood that change to "provid[e] the possibility of U.S. judicial assistance in connection with [administrative and quasi-judicial proceedings abroad]." S.Rep. No. 1580, at 7-8, U.S.Code Cong. & Admin.News 1964, pp. 3782, 3788; *see* Smit, International Litigation [under the United States Code, 65 Colum. L.Rev. 1015], 1026-1027, and nn. 71, 73 [(1965)] ("[t]he term 'tribunal' ... includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts"; in addition to affording assistance in cases before the European Court of Justice, § 1782, as revised in 1964, "permits the rendition of proper aid in proceedings before the [European] Commission in which the Commission exercises quasi-judicial powers").

*Id.* at 2578-58 (some citations omitted).

The Court concluded its discussion of the issue by noting the inherent governmental nature of the European Commission treatment of DG-Competition decisions, such that when the former reviewed the final decisions of the latter, "the investigative function

blur[s] into decisionmaking." *Id.* at 258 (quoting European Commission *Amicus Curiae* Brief, at 9). The European Commission "enforc[ed] enforcing European competition laws and regulations" by "acting through the DG-Competition." *Id.* at 254.

As a result, the Court could not find the DG-Competition investigation fell outside the scope of § 1782 without also finding that the European Court of Justice — a body which was indisputably judicial in nature—also would fall outside the scope of the statute. The Court concluded that "[w]e have no warrant to exclude the European Commission, to the extent that it acts as a first-instance decisionmaker, from § 1782(a)'s ambit."

Prior to *Intel*, two Circuits had recently addressed the issue of the use of § 1782 in aid of private arbitrations, both concluding that the statute was not intended for such application. In *NBC v. Bear Stearns*, 165 F.3d 184 (2nd Cir. 1999), the Second Circuit held that § 1782 did not apply to proceedings before private arbitration panels, as such a panel was not a "foreign or international tribunal," as that term is used in the statute. After finding the term was ambiguous, the court noted that although the legislative history included a specific reference to Congress's intent to broaden the statute to apply to "foreign administrative tribunal or quasi-judicial agency," there was no such indication that Congress intended the statute to apply to private arbitrations. 165 F.3d at 189-90. The court also stressed that a contrary ruling would compromise the efficiency and cost savings that arbitration seeks to promote.

In *Republic of Kasakhstan v. Biedermann Internat'l*, 168 F.3d 880 (5th Cir. 1999), the Fifth Circuit held that Congress had intended to broaden the application of the statute in 1964, but not so broadly as to sweep into its scope purely private foreign arbitrations. It, too, also

found that applying § 1782 to private arbitrations would undermine the advantages of that procedure.

In the immediate wake of *Intel*, several decisions concluded, often without substantial discussion, that the term "tribunal" in § 1782 includes private arbitrations. *In re Application of Roz Trading Ltd.*, 469 F.Supp.2d 1221, 1226 (N.D. Ga. 2006) (finding the term "tribunal" unambiguously included arbitration, because "there is no clearly expressed legislative intent that the term 'tribunal' does not include [private] arbitral panels"). Examining the functions of the private arbitration proceeding at issue in that case—the International Arbitral Centre of the Austrian Federal Economic Chamber in Vienna—the *Roz Trading* court stressed that Vienna Arbitration Centre was "constituted to hear disputes, weigh evidence, and issue rulings that will finally bind the parties in accordance with its Rules." 469 F.Supp.2d at 1225. The court further found that "the [Vienna] Centre's orders are enforceable in Austrian courts."

In *In re Application of Hallmark Capital*, 534 F.Supp.2d 951 (D. Minn. 2007), the court reached a similar result, following a similar analysis, in the case of a § 1782 subpoena in support of a private arbitration in Israel. The court stressed the general expansion of § 1782 in *Intel* and the Court's use of the passage from Professor Smit. *Id.* at 954-55. The court concluded that the arbitration panel was, like the European Commission in *Intel*, "a 'first-instance decisionmaker' that conducts proceedings which lead to ... dispositive ruling[s]." *Id. See also In re Babcock Borsig AG*, 583 F.Supp.2d 233 (D.Mass.2008); *Comision Ejecutiva Hidro Electrica Del Rio Lempa v. Nejapa Power Co.*, No. 08-135-GSS, 2008 WL 4809035 (D. Del. Oct. 14, 2008).

In *In re Application of Oxus Gold PLC*, 2007 WL 1037387, (D.N.J. April 2, 2007) the court found that § 1782 applied to arbitration arising under a Bilateral Investment Treaty (BIT) between the United Kingdom and the Kyrgyz Republic. Although the participants in the arbitration were "admittedly private litigants," the court stressed that the terms of the BIT "specifically mandates that disputes between nationals of the two countries would be resolved by arbitration governed by international law." *Id.* at *5. Given this mandate, and the fact that the resulting arbitration was "being conducted within a framework defined by two nations and is governed by the Arbitration Rules of the United Nations Commission on International Trade Law (the 'UNCITRAL rules')" the court held that a magistrate judge's decision that the arbitration was a "tribunal" within the meaning of § 1782 was not clearly erroneous. *Id.*

Other courts have reach an opposite conclusion. In *In re London Arbitration between Norfolk Southern v. General Security Ins.*, 626 F.Supp.2d 882 (N.D. Ill. 2009), the court concluded that the statute's reference to "arbitral tribunals" was limited to state-sponsored bodies, not to purely private arbitration. That is, the court concluded that *Intel* may have broadened the interpretation of the statute, but is was not intended to throw the doors open to all decision-making bodies.

> It is true, as some courts have noted, that the *Intel* Court both "emphasized Congress's intent to expand the applicable scope of § 1782(a)," *In re Babcock*, 583 F.Supp.2d at 240, and favorably quoted, albeit in dictum, a definition of the statutory term "tribunal" that expressly includes "arbitral tribunals." *Id.*, citing *Intel*, 542 U.S. at 258, 124 S.Ct. 2466 (" '[t]he term 'tribunal' ... includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts,' " (quoting Smit, International Litigation under

the United States Code, 65 Colum. L.Rev. 1015, 1026 n. 71 (1965))). Nevertheless, although the *Intel* Court acknowledged the ways in which Congress has progressively broadened the scope § 1782, it stopped short of declaring that *any* foreign body exercising adjudicatory power falls within the purview of the statute. Indeed, the ellipses in the Court's citation to Smit (without which Smit's definition reads, "[t]he term 'tribunal' *embraces all bodies exercising adjudicatory powers*, and includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts" (emphasis added)), suggest that the Court was not willing to embrace the full breadth of Smit's definition. Moreover, as the analysis in *In re Matter of the Application of Oxus Gold PLC* illustrates, a reasoned distinction can be made between arbitrations such as those conducted by UNCITRAL, "a body operating under the United Nations and established by its member states," and purely private arbitrations established by private contract. *Id.* at *6. While the private arbitral tribunal at issue here likely falls within the scope of "all bodies exercising adjudicatory powers," the *Intel* Court's language did not endorse such a broad definition of "tribunal." Accordingly, I interpret the *Intel* Court's reference to "arbitral tribunals" as including state-sponsored arbitral bodies but excluding purely private arbitrations.

626 F.Supp.2d 882 at 885.

Further, the court held, the emphasis in *Intel* on judicial reviewability — not simply enforceability — prevented application of § 1782 in the case of purely private arbitrations.

By contrast, private arbitrations are generally considered alternatives to, rather than precursors to, formal litigation. Indeed, it is common for arbitration provisions in private contracts to include a waiver of review by courts. Indeed, that is the case here. The section of ACE's reinsurance policy captioned "ARBITRATION" states that the decision of the "Board" (as previously defined) is final and binding on the parties, and that

Such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of fraud or collusion. Without limiting the foregoing, the parties waive any right to appeal to, and/or seek collateral review of the decision of the Board of Arbitration by any court or other body to the fullest extent permitted by applicable law.

It is clear from this text that the very narrow circumstances in which the Board's decisions may be subject to review does not allow for judicial review of the merits of the parties' dispute. Accordingly, the "arbitral tribunal" at issue here does not fall within the definition the Supreme Court embraced in its *Intel* dictum.

*Id.* at 886

The court reached a similar conclusion in *La Comision Ejecutiva Hidro Electrica Del Rio Lemp v. El Paso Corp.*, 617 F.Supp.2d 481, 483 (S.D. Tex. 2008), *aff'd* 341 Fed.Appx. 31 (5th Cir. 2009), holding that § 1782 could not be used as a basis for discovery in assistance of a foreign, private arbitration. The court found that the issue was *Intel* "shed no light on the issue," and "[i]n fact, the Supreme Court has not addressed the application of § 1782 to arbitral tribunals, not even in dicta." *Id.* at 485. The court then briefly recounted the Supreme Court's analysis in *Intel*, with its emphasis on judicial review, and concluded that the Directorate General in that case was "much like an administrative agency here in the United States." *Id.*

Consequent with *Intel*'s line of direction, it comes as no surprise that arbitral tribunals make not so much as a cameo appearance, but more that of an "extra" in *Intel*'s consideration of the scope of § 1782 tribunals. The Supreme Court further argued that the D-G Commission should be considered a § 1782 tribunal because Congressional pronouncements antecedent to the 1964 revision of § 1782 meant "tribunal" to possibly apply to "administrative and quasi-judicial proceedings abroad." *Intel Corp.*, 542 U.S. at 257-58, 124 S.Ct. 2466. As further support on this point, and only on this point, the Court cited Hans Smit ("Smit"), International Litigation under the United States Code, 65 Colum. L.Rev. 1015 (1965), which stated: "[t]he term 'tribunal' ... includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts." *Id.* at 258, 124 S.Ct. 2466. Here lies the trap for the unwary traveler. Because in between agreeing with Congress' report that § 1782 applied to administrative and quasi-judicial agencies Smit, not Congress, and not the Supreme Court, was of the opinion § 1782 also applied

to arbitral tribunals. The Supreme Court gave no indication they agreed with Smit on this issue, now before the district court.

        The Supreme Court was only making use of this quoted sentence from the article for the proposition that § 1782 applies to quasi-judicial agencies and administrative courts, following as it did the Court's actual quoting of Congressional pronouncements in the text of the opinion itself to the same effect. Smit does not speak for the Supreme Court. Until, and, if, the Supreme Court itself adopts Hans Smit's statements as its own within the text of the opinion itself, Hans Smit's opinions on arbitral tribunals has no more weight and authority than any other article. Smit's opinion is not even Supreme Court *dicta*.

*Id.* at 485-86.

*In re Operadora DB Mexico*, 2009 WL 2423138 (M.D. Fla. Aug. 4, 2009) is another case in the more recent series of decisions finding that § 1782 was not intended to apply to private arbitrations. In that case the court held that § 1782 was not available to aid in an International Chamber of Commerce International Court of Arbitration in Mexico. The court explicitly criticized *Roz Trading's* "flawed inference" that private arbitration panels were automatically rendered "tribunals" withing in the meaning of § 1782 by *Intel*. Instead, the court held, it was required to take "a functional analysis" similar to that employed in *Intel*. 2009 WL 2423138, at *9.

In reaching this conclusion, the court expressly disagreed with the early decisions of *Roz Trading*, as well as *Babcock*, and *Hallmark* for relying mainly on the phrase "arbitral tribunals" contained in the passage cited from the Smit article. As the court pointed out, that "parenthetical quotation [was] cited merely to support the proposition that § 1782 applies to administrative and quasi-judicial proceedings." *Id*. at *11 Moreover,

        the quote from Professor Smit's article refers not to "arbitral tribunals" but to "administrative and arbitral tribunals," which is offset by commas on

either side from "investigating magistrates" and "quasi-judicial agencies." The full context of the quote supports the NBC court's finding that § 1782 applies only to governmental and state-sponsored arbitral tribunals, not private arbitral tribunals.

*Id*. at *11 n. 11.

Further, the court stated, such an inference based on such a tangential reference was unsupported in light of existing circuit law clearly holding that purely private arbitration was not within the scope of § 1782. The court found it doubtful that the Supreme Court would have intended on reversing *NBC* and *Biedermann sub silentio*, expressing itself "confident that the Supreme Court would not have expanded § 1782 to permit discovery assistance in private arbitral proceedings and reversed *NBC* and *Biedermann* — without even acknowledging their existence — in a parenthetical quotation supporting an unrelated proposition."[2]

More importantly, those earlier courts failed to conduct a full functional analysis of the specific arbitration in question, merely focusing on whether the arbitration was binding. The courts failed to

consider[] other relevant functional characteristics of such proceedings. For example, the district courts did not consider how each proceeding is created or whether its authority to issue binding decisions is the result of private

---

[2] The court in *In re London Arbitration* was equally doubtful:

I also note that is not unreasonable to suppose that if the *Intel* Court had intended its holding to extend § 1782 to purely private arbitrations, it might have made some mention of the Second and Fifth Circuit authority expressly holding the contrary. The Court referred to neither case, however.

626 F.Supp.2d 882 at 885.

contract or domestic or international law. In contrast, *NBC* and *Biedermann* examined these fundamental differences in detail, finding that proceedings that are the product of contractual agreements to resolve disputes are functionally different than, and often opposed to, state-sponsored proceedings. *See, e.g. NBC*, 165 F.3d at 191 (noting that, in a private arbitral proceeding, a party's "tactical use of discovery devices" such as § 1782 may deprive the other party of "its bargained-for efficient process"). This Court agrees with the thorough analysis of *NBC* and *Biedermann* and concludes that the origin of the ICC Panel's authority and its purpose militate against classifying it as a foreign or international tribunal under § 1782.

*Id*. at * 11.

The court conducted a detailed analysis of the ICC arbitration, finding that while it had "some of the attributes of a foreign or international tribunal," such as the gathering of evidence and the issuing of a final decision, the "other significant characteristics of the ICC Panel foreclose its classification as a foreign or international proceeding under § 1782." *Id.* at *9. The court found that in *Intel*, the Court had defined such a final decision as "a final administrative action both responsive to the complaint and reviewable in court." 542 U.S. at 255.

In this case, although the decisions of the ICC Panel are final and binding on the parties, those decisions are not judicially reviewable. The ICC Rules dictate that the ICC Panel must submit its proposed award to the ICC Court, whose review is limited to "lay[ing] down modifications as to the form of the Award." The ICC Court "may also draw [the ICC Panel's] attention to points of substance," but must do so "without affecting the [ICC Panel's] liberty of decision." The ICC Rules do not provide for any review by a state-sponsored tribunal. Even if the ICC Court could affect the ICC Panel's substantive decision, this method of review would present a question similar to the one the Court is currently considering: Whether review by the private, contractually created organization that sponsored the ICC Panel constitutes "judicial review" as that term is used in *Intel*. Unlike the Court of First Instance and the European Court of Justice, it is not "beyond question" that the ICC Court is a tribunal under § 1782. Indeed, determining whether the ICC Court is a foreign tribunal under § 1782 potentially presents the same issues as determining whether the ICC Panel is a foreign tribunal under §

1782.

Finally, the court found that a functional analysis

should also consider the origin of its decisionmaking authority and its purpose. That is, the criteria adopted by Supreme Court for its functional analysis in *Intel* were based, in part, on the particular characteristics of the DG-Competition and the European Commission. The Supreme Court did not consider whether additional criteria would be relevant if it were to consider a different kind of proceeding. For example, unlike the ICC Panel at issue in this case, the DG-Competition and European Commission were, without question, state-sponsored. Thus, the Supreme Court did not consider whether the source of the proceeding's authority to issue binding decisions or its purpose are relevant criteria. If it considered a proceeding such as the ICC Panel, the Supreme Court may consider these criteria because they are unique and salient features of private arbitral proceedings. Accordingly, the Court will examine the source of the ICC Panel's authority and its purpose.

The Court finds that the source of the ICC Panel's authority and its purpose are functional attributes that militate against classifying it as a foreign or international proceeding under § 1782. The ICC Panel's authority derives from a private agreement between Operadora and Hard Rock Limited to resolve all of their disputes through the ICC Court. The parties selected the ICC Court as an alternative to governmental or state-sponsored proceedings. *See Arbitration in London*, 2009 WL 1664936 at *4 (noting that "private arbitrations are generally considered alternatives to, rather than precursors to, formal litigation"). Because the ICC Panel's authority derives from the parties' agreement, its purpose is fundamentally different than that of a governmental or state-sponsored proceeding. See NBC, 165 F.3d at 190 (stating that "the popularity of arbitration rests in considerable part on its asserted efficiency and costeffectiveness — characteristics said to be at odds with full-scale litigation in the courts") (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 280, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)); *Biedermann*, 168 F.3d at 883 (stating that "[a]rbitration is intended as a speedy, economical, and effective means of dispute resolution"); *La Comision*, 2008 WL 5070119 at *4 (stating that private arbitral tribunals are entirely separate from the judiciary). In addition, Congress has long recognized the competing purposes of private arbitrations and state-sponsored tribunals. See *Allied-Bruce*, 513 U.S. at 270-71 (recounting the history of the FAA, including the "ancient" fight of English courts against private arbitral proceedings, and concluding that the FAA's primary purpose was to "overcome courts' refusals to enforce agreements to arbitrate" and to "place such agreements upon the same footing as other contracts").

*Id.* at *10-11.

*OJSC Ukrnafta v. Carpatsky Petroleum*, No 09-MC-265, 2009 WL 2877156 (D.Conn.

Aug. 27, 2009) involved a dispute between two American and one Ukranian oil companies.

One of the Amerian companies had brought an arbitration claim before the Arbitration

Institute of the Stockholm Chamber of Commerce (AISCC). The Ukranian company then

filed a claim in Swedish District Court seeking a declaration that the arbitration panel

lacked jursidiction, and sought discovery from a third party under 28 U.S.C. § 1782. The

court held that § 1782 was applicable, in light of the ongoing proceeding in the Swedish

Court, and the fact that the arbitration arose under rules issued by the United Nations

Commission on International Trade Law (UNCITRAL). The court also followed *Oxus Gold*

in distinguishing between "purely private arbitration" and arbitration conducted under

state sponsorship, such as UNCITRAL

> The *Intel* court's reference to "arbitral tribunals," at minimum, would include
> international-government sanctioned tribunals. *See Intel*, 542 U.S. at 258; *see
> also Biedermann*, 168 F.3d at 882 ("References in the United States Code to
> 'arbitral tribunals' almost uniformly concern an adjunct of a foreign
> government or international agency.") (footnote omitted). "Indeed, it is
> common for arbitration provisions in private contracts to include a waiver
> of review by courts," *In re Arbitration in London*, 2009 WL 1665936, at *4, but
> that is not the case here when the arbitration is governed by the rules of
> UNCITRAL. In this case, there is sufficient judicial reviewability, as there is
> a coinciding jurisdictional challenge pending before the Swedish Court for
> which Urknafta could seek discovery under Section 1782, and either or both
> parties can seek review of the decision of the arbitral tribunal. Thus, AISCC
> is acting as a "first-instance decision maker," whose decision may be subject
> to review, and thus falls within the purview of Section 1782. *Intel*, 542 U.S. at
> 258.

2009 WL 2877156, at *4.

In *In re Application of Winning  (HK) Shipping*, No. 09-22659-MC, 2010 WL 1796579

(S.D. Fla. April 23, 2010), the court found that § 1782 applied in the case of a purely private arbitration, based upon the court's determination — and the respondent's effective concession — that the relevant agreement was governed under the Arbitration Act 1996 (of England) which specifically provided that "the decisions of the arbitrators are reviewable by the English Courts." *Id*. at *9. Even though the original agreement to arbitrate arose from agreement and was thus "much like a purely private arbitration," the court was "constrained by the Supreme Court's ruling in *Intel*," with its emphasis on judicial reviewability. *Id*.

> the undersigned has found no case which expressly addressed the issue of judicial reviewability and held that where a decision by a dispute resolution body was reviewable on *both substantive and procedural grounds*, that body was not an International tribunal under section 1782."

*Id.* (emphasis added).

The court finds that Congress did not intend, by its use of the term "tribunal" in § 1782, to create a vehicle for discovery in aid of foreign, private arbitrations.

The term "tribunal" is not free from ambiguity, as its meanings range from the more specific and jurisprudential ("the seat of a judge … a court of justice" to the most generalized and informal ("any real or imagined seat of judgment; as, the *tribunal* of popular sentiment.") Webster's New Twentieth Century Dictionary of the English Language, 1949 (2d ed. 1964).

A similar range of meanings from the historical to figurative is presented in The Oxford English Dictionary (1933):

**1.** Originally, A raised semicircuilar or square platform in a Roman basilica,

on which the seats of the magistrates were placed; a dais; a raised throne or chair of state; a judgment seat (also *fig.*).

**1526** *Pilgr. Perf.* (W. de W. 1531) 212  We shall stande before the tribunall of god. **1590** Spenser *F.Q.* III. v. 53  And crowne your heades with heavenly coronall, Such as the Angels weare before Gods tribunall.  **1642** in 10th *Rep. Hist. MSS. Comm.* App. IV. 429  Making 2 Tribunalles or seates for the judges at the last assizes  **1702** Echard *Eccl. Hist.* (1710) 612  They will be both read in the day of Judgment, before the Tribunal of Jesus Christ.  **1833** Cruse *Eusebius* V. i. 170  Those around the tribunal cried out against him.

**2.** A court of justice; a judicial assembly.

**1590** Spenser *F.Q.* II. ix. 53  Painted faire .. with picturals Of Magistrates, of courts, of tribunals.  **1610** Holland *Camden's Brit.* (1637) 177  The Tribunals, or courts of Justice in England.  **1667** Milton *P.L.* III. 326  When thou .. shalt .. from thee send The .. Arch-Angels to proclaime Thy dread Tribunal.  **1687** T. Brown *Saints in Uproar* Wks. 1730 i. 82 I am forced to appeal to your impartial tribunal.  **1835** Alison *Hist. Europe* (1874) IV. xiv. 137  On the 14th October [1743] the Queen was brought before the Revolutionary Tribunal.  **1867** Freeman *Norm. Conq.* I. vi. 574  The judgement of a competent tribunal is always worth something.

**b.** *fig.* Place of judgement or decision; judicial authority.

**1635** Quarles *Embl.* II. xiii. 49  Go up, my soul, into the tribunal of thy conscience.  **1734** tr. *Rollin's Anc. Hist.* (1827) I. 153  The field of battle is a tribunal without partiality and cabal.  **1827** Bentham *Parl. Reform* Introd. 222  By the tribunal of public opinion it ought to be taken as and for confessional evidence.  **1875** Whitney *Life Lang.* viii. 150  Our recognition of the community as final tribunal which decides whether anything shall be language or not.

*Intel* provides no controlling direction on the question. *In re Operadora*, 2009 WL 2423138 at *6; *Winning Shipping*, 2010 WL 1796579 at *7.  In *Intel*, the Court recognized that Congress intended to broaden § 1782 to reach beyond "'conventional courts' … to 'administrative and quasi-judicial proceedings.'" 542 U.S. at 249 (quoting S.Rep. No. 1580,

88th Cong. 2d Sess., 7 (1964) U.S. Code Cong. & Admin. News. 1964, p. 3782). In the original 1958 charge to the Commission on International Rules on Judicial Procedure, Congress authorized the Commission to develop proposed legislation for improving "'judicial assistance between the United States and foreign countries.'" 542 U.S. at 248 (quoting Act of Sept. 2, Pub.L. 85-906, § 2, 72 Stat. 1743. S.Rep. No. 2392, 85th Cong. 2d Sess. 3 (1958).

Accordingly, the Supreme Court recognized in *Intel* that Congress intended § 1782 to apply more broadly than traditional, "conventional" courts. But nothing in the opinion may be fairly taken as either requiring or supporting the application of the statute to the other extreme of dispute resolution — arbitrations conducted by private agreement, with only the most limited form of judical review.

The Directorate General - Competition in *Intel* was essentially an arm of the state, as the means by which the European Commission "act[ed to] enforce[] European competition laws and regulations." 542 U.S. 254. The Directorate was the sole evidence-gathering vehicle for the European Commission's Court of First Instance and the Court of Justice, entities which were "[b]eyond question" traditional courts, and thus "tribunals" within the meaning of § 1782. *Id.* at 257. The court repeatedly emphasized that decisions of the Directorate was subject to "judicial review" by the Court of First Instance and the Court of Justice. *Id.* at 254-55.

The court finds that the passage in *Intel* cited by applicants, in which the Court

quoted Professor Smit's conclusion that the term tribunal "includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies," *id.* at 258, quoting Smit, International Litigation under the United States Code, 65 Colum.L.Rev. 1015, 1026-27 (1965) provides no guidance here.

First, the Court was citing Smit's article merely as additional support for its finding that § 1782 was intended to provide "assistance to foreign courts *and quasi-judicial agencies*." *Id.* at 258 (quoting, and adding emphasis to, § 2, 72 Stat. 1743). Moreover, the passage from the Smit article, read in context, also demonstrates support for the conclusion that § 1782 applies to "governmental and state-sponsored arbitral tribunals." *In re Operadora DB Mexico*, 2009 WL 2423138, at *11, n. 11.

The applicants correctly note that Smit also states in his article that "tribunal" should be understood to include "all bodies exercising adjudicatory powers," 65 Colum. L.Rev. at 2026. n. 71, and argue that such a construction would include private arbitrations. While this, arguably broader, definition does occur in Professor Smit's article, it formed no part of the *Intel* Court's opinion for the simple reason that *the Court excised that broader language from its quotation*, replacing it by ellipsis. 542 U.S. at 258. By doing so, the Court signalled that it was unwilling to embrace the more expansive usage of the term.

Further, the court must determine Congress's intent in passing the 1964 amendments to § 1782, and Smit's 1965 article is accordingly only indirect evidence at best of that intent. In contrast, the Senate Report on those amendments includes reference to an earlier article

by Smit, Assistance Rendered by the United States in Proceedings Before International Tribunals, 62 Colum. L.Rev. 1264 (1962). In that article, discussing proposals to improve the law providing for witness statements in aid of international tribunals, the only reference to international arbitrations are to state-sponsored or bilateral investment treaty arbitrations. *Id.* at 1267, 1274.

Perhaps a stronger indication of the Court's intent in *Intel* is what it did *not* do. The court agrees with those decisions finding it extremely doubtful that the Court would have intended its opinion to throw open the interpetative doors of § 1782 to reach purely private arbitrations, since such an interpretation would effectively overrule — without any analysis or even mention of — two prominent decisions finding that that statue had no such application, *NBC* and *Biedermann*.

And those well-reasoned decisions present a strong basis for concluding that Congress would not have intended such a sweeping interpretation of § 1782, where the necessary result would be a contradiction of another strong policy, encouraging the use of arbitration. *See Hall St. Assocs., LLC v. Mattel, Inc.,* 552 U.S. 576, 585-86 (2008). Interpreting § 1782 to apply to voluntary, private international arbitrations would be a body blow to such arbitration, since it would create a tremendous disincentive to engage in such arbitration wherever, as here, such a reading would create substantially asymmetrical discovery obligations.

The court finds that § 1782 was not intended to apply to the sort of voluntary,

private arbitration of the type exemplified here. *See In re Operadora DB Mexico*, 2009 WL 2423138, at *10-11 (M.D. Fla. Aug. 4, 2009). In this case, the parties voluntarily agreed to resolve their claims via arbitration. Further, the results of the arbitration are subjection only to the most limited of review. Judicial review of the arbitration award does not include review of legal or factual conclusions. Instead, the award is generally enforceable internationally, and may be set aside in extremely limited circumstances (such as lack of jurisdiction, failure of the tribunal to abide by its mandate, or violation of due process or international public policy). *See* New York Convention on the Enforcement and Recognition of Foreign Arbitral Awards art. V, Jun. 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38. Considering the nature, function, and source of the Butachimie-related arbitrations, the court finds that these are proceedings are not "tribunals" within the meaning of § 1782.

In addition, as the court stressed in *Intel*, district courts retain inherent discretionary power under § 1782 to decline to grant the requested discovery. Even if the court were to conclude that § 1782 did generally apply to private arbitration, it would conclude that the circumstances of the cause support denial of the requested subpoena.

Relevant factors for the court to consider in the exercise of its discretion under § 1782 include (a) whether target of the requested discovery is a participant in the foreign proceeding, (b) the nature and character of the foreign proceeding, including the tribunal's "receptivity … to U.S. federal-court judicial assistance," (c) whether the request conflicts with foreign public policy or discovery restrictions, and (d) whether the request is unduly

intrusive or burdensome. 542 U.S. at 264. In addition, while "[c]oncerns about maintaining parity among adversaries" do not justify a "cross-the-board … rule" precluding § 1782 relief, those concerns may be relevant as one additional factor in the district court's discretionary treatment of a specific § 1782 request. *Id*. at 252.

These factors do not support the relief sought here. First, both the Rhodia applicants and INVISTA are parties to the foreign arbitration. Accordingly, under the agreed-to rules of the arbitration, the parties are aleady subject to specific discovery obligations. While applicants allege that respondents have refused to comply with discovery orders of the Arbitral Tribunal, the applicants also have an effective remedy for such alleged violations by seeking an adverse inference from the Tribunal. And indeed, applicants have followed this route, and requested such inference. The court finds that the requested information is not "unobtainable absent § 1782 aid." *Id.*

Second, and turning to the nature and character of the foreign proceeding, applicants may complain that it has not succeeded in using the Tribunal as means to obtaining the information sought, but this objection bears little weight, as the applicants voluntarily entered into the arbitration, specifically including and agreeing to its limited discovery. As noted earlier, applicants specifically eschewed any desire for "American-style discovery or productions of documents." Accordingly, an award of substantial discovery would conflict with agreed-to rules for limited discovery in the proceedings before the Arbitral Tribunal.

Nor is there any substantial indicia that the Tribunal is particularly receptive to substantial additional discovery. Applicants point to the Tribunal's Deecember 9, 2010 order as indicating approval for their proposal to secure additional evidence by "competent judicial authority," that is, by § 1782. But the Tribunal's order in context represents not so much approval as merely a scheduling requirement, providing that if applicants "intend to request any such relief," they must submit their application 15 days before the start of the evidentiary hearing.

Finally, the court finds that the requested discovery is not justified in light of the advanced state of the arbitration proceedings, and the corresponding delay in applicants' request for relief under § 1782. As originally scheduled, applicants presented their request only weeks ahead of the final phase of the first arbitration proceeding. This is after (by applicants' own narrative) INVISTA constantly thwarting or ignoring their discovery request for a year and a half.

Given the timing of the present application, the substantial body of information involved, touching or potentially touching upon complex technical and confidential matters, and the existence of the on-going, voluntary arbitration proceedings with their discrete and independent rules for the production of documents, the court in its discretion finds that the interests of justice would not support the applicants' request under § 1782.

The court notes that the proceedings have been sealed pursuant to Rhodia's initial Motion for Leave to File Under Seal. (Dkt. 1). In its motion, Rhodia cites Article 17.1 of the

Terms of Reference in the ICC Arbitration:

> The Parties undertake to preserve the confidentiality of any awards and orders, submissions and transcripts, as well as any documents submitted by another Party in the course of the arbitral proceedings, not available to the public, except where disclosure may be required from a Party by a legal duty, in order to preserve or enforce its right or to enforce or appeal an award before a judicial authority. This undertaking also applies to the arbitrators, experts appointed by the Arbitral Tribunal and the secretary of the Tribunal.

Beyond this, the Motion to Seal is not pressed vigorously, with the Rhodia applicants emphasizing *INVISTA*'s position that materials from the first arbitration "should not be disclosed publicly," and Rhodia stating merely that its motion was filed "out of abundance of caution." (Dkt. 1, at 2).

> [A]ny motion to seal must establish that interests which favor non-disclosure outweigh the public interest in access to court documents. *See Nixon v. Warner Commc'ns*, 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 461 (10th Cir.1980). The public has a fundamental interest in understanding disputes that are presented to a public forum for resolution. *Crystal Grower's Corp.*, 616 F.2d at 461. In addition, the public interest in district court proceedings includes the assurance that courts are run fairly and that judges are honest. *Id.* To establish good cause, a moving party must submit particular and specific facts, and not merely "stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

*Sibley v. Sprint Nextel*, 254 F.R.C. 662, 667 (D. Kan. 2008). *See also Allen v. Kline*, No. 07-2037-KHV, 2007 WL 3396470, *1-2 (D.Kan. Nov. 13, 2007) (citing *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 944 (7th Cir.1999)).

The present Order will be unsealed in its entirety in the absence of a contrary showing of good cause. Any party seeking redaction of the court's Order shall do so within seven days.

IT IS ACCORDINGLY ORDERED this 25th day of March, 2011, that the Applicants' request for discovery is hereby denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE